1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

A.A., et al.,

No.  2:13-cv-01167-KJM-EFB

12

Plaintiffs,

13

v.

ORDER

14

JONATHAN RAYMOND, in his personal
and official capacity as Superintendent of the

15

Sacramento City Unified School District,

16

Defendant.

17
18

Plaintiffs' motion for preliminary injunction seeks to enjoin the closure of seven

19

elementary schools within the Sacramento City Unified School District.  The court conducted

20

an evidentiary hearing and heard argument on the motion on July 11, 2013.  Mark Merin

21

appeared for plaintiffs and Gregory Wegner and Sloan Simmons appeared for defendant,

22

District Superintendent Jonathan Raymond.  Following the hearing, the court took the matter

23

under submission, in order to carefully evaluate the parties' positions and deliberately arrive at

24

its considered legal opinion.   For the reasons explained below, plaintiffs' motion is DENIED.

25

First, though, given the nature of the decision the court is called to make, and the

26

tenor of the parties' arguments, the court briefly clarifies its role:  Even if the court had a hunch

27

that a case could be made for plaintiffs' prevailing on the merits in their effort to prevent the

28

school closures, that hunch could not dictate the result here.  Even as the court assumes

significant hardships will be imposed on plaintiffs as a result of the schools' closing, that assumption alone does not justify weighing plaintiffs' hardships against those of the District if a preliminary injunction were granted, if plaintiffs here have not satisfied the first "likely success" step of the legal analysis required when a party seeks an injunction.  If the court's job were to make a public policy decision, in a local legislative capacity, the court would have the option of calling for a longer period of deliberation prior to a final school closure decision, or of casting its vote with the dissenting members of the school board who opposed closure.  But a federal trial court is not simply another policymaking branch, free to undo a decision even if it perceives that decision as flawed in more than one respect.  As an independent court of law, established under Article III of the U.S. Constitution, it responds neutrally to the questions presented to it in a given case, within the parameters established by the parties' pleadings and motions.  Time-tested rules of evidence guide the court in determining what information is properly in the record for review.  Legal precedent guides the court's analysis, which leads to its conclusions.

In this case, the established law the court must apply, without respect to persons, requires that plaintiffs first establish a likelihood of success on the legal merits of their claims. Plaintiffs' evidence and arguments, when evaluated neutrally and objectively, have not cleared this first "likely success" hurdle of the preliminary injunction test.  As explained below, this conclusion begins and ends the court's analysis with respect to each of plaintiff's claims.

I.      INTRODUCTION

This case arises from the decision of the Sacramento City Unified School District ("District") on February 21, 2013, to close C.B. Wire, Collis P. Huntington, Fruit Ridge, Joseph Bonnheim, Maple, Mark Hopkins, and Washington Elementary Schools. According to the District, the decision to close schools was based on declining school enrollment combined with the District's budget problems.  The District asserts that it selected schools for closure using an objective measurement of each school's "efficiency," determined by dividing the current number of students by the amount of "teachable space" in the facility. Although eighteen schools were considered at one point or another for closure based on this

2

criterion, only seven ultimately were closed.  The other schools were removed from consideration at various times in the decision-making process at the recommendation of defendant Raymond, who is sued in his individual and official capacities.[1]

Plaintiffs allege that this decision-making process resulted in the closure of schools with high populations of minority students, and in neighborhoods with high concentrations of minority residents, and will have adverse impacts on students with disabilities.  They allege that the standards used to measure school efficiency were flawed, that the District deviated from established procedures, and that the closure timeline was intentionally rushed in order to prevent parents from effectively opposing the closures.  Furthermore, they allege that schools in white neighborhoods and schools with higher proportions of white students were spared from closure for various pretextual reasons.  Plaintiffs seek to halt the closure process, while the District alleges it has already completed much of the work to close the schools in preparation for Fall classes.

Plaintiffs filed their original complaint on June 11, 2013 (ECF 1) and then moved for a preliminary injunction to enjoin the closure of the seven elementary schools (ECF 17).  Plaintiffs filed a first amended complaint on June 20, 2013.  (ECF 36.)  Plaintiffs' motion for a preliminary injunction is based on their first, third, and fourth causes of action: (1) violation of the Equal Protection Clause of the Fourteenth Amendment asserted under 42 U.S.C. § 1983; (3) violation of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*; and (4) violation of the Procedural Due Process Clause of the Fourteenth Amendment asserted under 42 U.S.C. § 1983.[2]  Defendant has moved to dismiss certain causes of action in the

---

[1] Although plaintiffs allege that people and entities distinct from defendant Raymond committed many of the acts that violated their rights, no party contends that necessary parties are absent from this suit or that defendant Raymond is incapable of granting the relief requested in this motion.  Accordingly, the court adopts the parties' conventions for identifying the various actors in this case while noting that there is only one named defendant.

[2] On July 3, 2013, the parties filed a joint status report indicating, *inter alia*, that they would file a stipulation in which plaintiffs would voluntarily dismiss the second and fifth causes of action in the amended complaint.  (ECF 72.)

1    amended complaint.  (ECF 38.)  The court does not resolve the motion to dismiss in this order.

2            Plaintiffs Ant. and Ang. R. B., who attended Joseph Bonnheim, are multi-ethnic,

3    of Latino, Native American, and White heritage.  (Romero Decl., ECF 17-28 ¶¶ 1–2.)

4    Plaintiffs D.S., A.A. and D.A., who are Mexican-American, also attended Joseph Bonnheim.

5    (Aleman Decl., ECF 17-19 ¶ 1; Arriaga Decl., ECF 17-21 ¶¶ 1–2.)

6            D.A. has Attention Deficit Disorder ("ADD") and his mother has worked with

7    the staff at Joseph Bonnheim to develop a comprehensive plan to keep him on track.  (ECF 17-

8    21 ¶ 3.)

9            Plaintiff C.S., who is Caucasian, attended Washington Elementary; he has

10   Autism Spectrum Sensory Challenges, Attention Deficit Hypertension Disorder ("ADHD") and

11   possibly Tourette's syndrome.  (Salazar Decl., ECF 17-29 ¶¶ 2, 5.)  He has an Individualized

12   Education Program ("IEP") and has been assisted by the same Resource Specialist Program

13   ("RSP") Teacher for the past two years.  (*Id.* ¶ 5.)

14           Plaintiff J.M, who is Mexican-American, attended Maple Elementary.  (Virgen

15   Decl., ECF 17-30 ¶ 1.)  J.M. is in a special education class and has an IEP.  (*Id.* ¶ 2.)

16           Plaintiff Chao Chang, who is Hmong and does not speak English, avers that she

17   has a nine year old son who attended C.B. Wire Elementary.  (Chang Decl., ECF 17-25 ¶ 1.)

18   This child is not identified as a plaintiff.

19           Plaintiff J.G. attended Mark Hopkins.  (Gentle Decl., ECF 17-26 ¶¶ 1–2.)

20           Plaintiff E.C. attended C.B. Wire, as did his older siblings and other members of

21   his family.  (Camargo Decl., ECF 17-23 ¶¶ 2–3.)

22           Plaintiffs C.G. and V.M., who are Mexican-American, attended C.B. Wire.

23   (Casillas Decl., ECF 17-24 ¶¶ 1–2.)

24   II.     EVIDENTIARY OBJECTIONS

25           The court first addresses evidentiary objections, as they affect the evidence that

26   may be considered.  Plaintiffs have not objected to any of defendant's evidence.  Defendant

27   objects to the admission of testimony by Dr. Jesus Hernandez and Dr. Anne Galletta on the

28   grounds neither qualifies as an expert under Federal Rule of Evidence 702.  Because Dr.

Galletta's declaration relates exclusively to plaintiffs' relative hardships if the closures are permitted to continue, and this order does not reach the hardships question, the court does not address defendant's objections to her testimony.  Defendant also objects to the admissibility of portions of the declarations of the parents and guardians of the student plaintiffs, and of plaintiffs' attorney, Mark Merin, the merits of which are discussed below.

A.      Legal Standard for Testimony of Expert Witnesses

Rule 702 of the Federal Rules of Evidence allows the court to admit expert testimony when "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.  Rule 702 reflects the holding of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert I*"), which recognized the trial court's role as a "gatekeeper" to exclude "junk science" by making a preliminary assessment of: (1) the reliability of the reasoning and methodology underlying the expert testimony; and (2) the applicability of that reasoning and methodology to the facts at issue.  *Daubert I*, 509 U.S. at 592–93; *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended sub nom. Mukhtar v. Cal. State Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003).  In a jury trial setting, judges are tasked with analyzing "not what the experts say, but what basis they have for saying it."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").  In *Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court held that a district court's gatekeeping function was not limited to scientific testimony but rather covered all expert testimony, as Rule 702 also reflects.[3]  In all cases, "[i]t

---

[3] "An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. [citation omitted] . . . The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  FED. R. EVID. 702 ADVISORY COMM. NOTES (2000).

is the proponent of the expert who has the burden of proving admissibility." *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

While the Rule 702 inquiry is a flexible one, *Daubert I*, 509 U.S. at 594, district courts consider four non-exclusive factors in determining the reliability of an expert's methodology under Rule 702(c): (1) whether the method has gained "general acceptance" in the relevant scientific community; (2) whether the method has been peer-reviewed; (3) whether the method "can be (and has been) tested;" and (4) whether there is a "known or potential rate of error." *Lust By & Through Lust*, 89 F.3d at 597 (citing *Daubert I*, 509 U.S. at 594). However, the Supreme Court has stressed that these factors are merely meant to be helpful, and some factors will not apply depending on the factual circumstances of each case. *Kumho*, 526 U.S. at 151.

The *Daubert* analysis is especially flexible when the finder of fact is a judge rather than a jury, when the gatekeeper and the gated community are one and the same. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

In line with this logic, a trial court may admit expert testimony for purposes of a preliminary injunction evidentiary hearing and conduct its *Daubert* analysis in tandem with its assessment of the evidence's weight. *See, e.g., Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-SAJ, 2008 WL 4453098, at *4 (N.D. Okla. Sept. 29, 2008) (admitting all expert testimony for preliminary injunction hearing and applying *Daubert* to determine the appropriate weight), *aff'd sub nom. Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, No. CIV. 00-1647 JP/RLP, 2002 WL 34365244, at *2–3 (D.N.M. Sept. 30, 2002) (addressing *Daubert* challenges after admitting all expert evidence in preliminary injunction evidentiary hearing). Even in these cases, the court must still conduct the *Daubert* analysis and make an explicit finding of the expert testimony's reliability, even if it does not conduct a separate *Daubert* hearing. *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007). Because the

6

1    court is not required to conduct a *Daubert* hearing, it may similarly determine prior to any

2    hearing allowed that some evidence clearly does not meet the *Daubert* standard.  *See*

3    *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009) (finding that

4    briefing alone "comprised an adequate record from which the court could make its [*Daubert*]

5    ruling").

6           B.      Application to the Testimony of Dr. Jesus Hernandez

7                   Defendant objects to the testimony of Dr. Hernandez on the grounds that it

8    meets neither the reliability nor relevance prong of the standard for admission of expert

9    testimony.  Dr. Hernandez has a Ph.D. in Sociology and has authored multiple publications on

10   segregated housing patterns in Sacramento.  He also has practiced as a real estate agent for

11   nearly thirty years, and concurrently has worked as a staff mental health specialist and a Social

12   Services program analyst for the State of California.  (Hernandez Decl. Ex. 1, ECF 17-13 at 1,

13   6.)  Dr. Hernandez's declaration and accompanying report discuss a number of topics: (1) a

14   geographical analysis of Sacramento's neighborhoods and their racial composition based on

15   historical events (Parts II and III of his report); (2) a chronological summary of the closure

16   decision-making process (Part IV); (3) a recalculation of the district's efficiency metric for

17   Maple Elementary and C.B. Wire Elementary (Part IV); (4) an analysis of the Board of

18   Education's decision to remove certain schools from the closure list (Part IV); (5) an analysis

19   of the fiscal rationale for the school closures, including the impact of the state's new Local

20   Control Funding Formula ("LCFF") (Parts V and VI); and (6) legal conclusions about the

21   closure decision (Part VII).  (Hernandez Decl. Ex. 2, ECF 17-14.)

22           1.      Reliability

23                   Defendant claims that Dr. Hernandez "has no background, experience or

24   training with California school law under the Education Code, or the process and

25   considerations attendant to a governing board's considerations of and ultimate decision on

26   whether or not to close schools, other than what he read in connection with this assignment."

27   (Def's. Obj., ECF 61 at 4.)  He further objects that the Dr. has never testified on school closure

28   issues or qualified as an expert witness in any field.  (*Id.*)  The latter objection is overruled, as

repeat testimony as an expert is not a prerequisite to qualifying as one.  *United States v. Smith*, 520 F.3d 1097, 1105 (9th Cir. 2008), *aff'd en banc*, 561 F.3d 934 (9th Cir. 2009).

The court finds that Dr. Hernandez's testimony on the racial composition of Sacramento's neighborhoods is based on reliable methodology.  His conclusions regarding housing patterns and the racial makeup of the affected neighborhoods are based on reliable sources, including the U.S. Census Bureau, public records of Sacramento County, and his own published research.  Plaintiffs have met their burden of showing reliability under *Daubert* and *Kumho* on this subject.  The court recognizes that the census tracts Dr. Hernandez used to define "neighborhoods" do not align with the district's attendance zones in all cases, and discounts the weight of his testimony accordingly.  Dr. Hernandez's characterization of the school closure chronology also is given little weight, as the timeline is not in dispute and objective information on this point is presented elsewhere in the record.

On the other hand, Dr. Hernandez's testimony about the efficacy of the District's methodology for calculating capacity, referred to as "right-sizing," does not meet *Daubert* standards of reliability for expert witnesses.  Plaintiffs presented no evidence suggesting Dr. Hernandez has any background in the field of education or has previously examined metrics used to identify schools for closure.  He provides no foundation for how he determined that, for example, including staff work rooms or computer labs in the capacity calculation was methodologically flawed.  By his own admission, Dr. Hernandez only applied his methodology to two schools in the district, making it impossible for him to make reliable conclusions about their efficiency compared to other schools for which he did not recalculate efficiency.  Although a *Daubert* analysis focuses primarily on the expert's methodology rather than conclusions, a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* [unsupported assertion] of the expert."  *Id.*  Furthermore, Dr. Hernandez based his testimony largely on conversations with unidentified witnesses, making it impossible for defendant to properly rebut his conclusions.  (Tr. of July 11, 2013 Evidentiary Hearing,

ECF 76 at 47.)  Because of these flaws in Dr. Hernandez's methodology, the court limited him

to providing lay testimony regarding his observations at two schools, Maple and C.B. Wire, as

general evidence that the right-sizing calculations were an imprecise measurement of efficiency

as to those schools.

Additionally, few of Dr. Hernandez's opinions about the rationality, or lack

thereof, of removing certain schools from the closure list meet the *Daubert* standard.  The only

reliable evidence Dr. Hernandez presented is that the removal of two other schools, Bret Harte

and Susan B. Anthony, on the grounds of their proximity to future proposed residential

development was an inconsistent application of a new criterion, as new housing developments

currently exist near newly closed schools as well.  Dr. Hernandez's real estate expertise and

prior studies of Sacramento housing patterns sufficiently qualify him to make such a critique of

this process.  However, his other critiques, including that the District did not assess properly

school safety concerns and inappropriately planned renovations at less efficient schools, are not

reliable, as Dr. Hernandez has no background or experience in education or school

administration on which to base such opinions.

Dr. Hernandez's analysis of the fiscal rationale for closing elementary schools

does not meet the reliability prong of *Daubert*.  Dr. Hernandez has no background in education

finance that qualifies him to critique the school's budgetary decisions.  While Rule 702 does

not require Dr. Hernandez to hold any specific official credentials or qualifications, *Smith*, 520

F.3d at 1105 (citing *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir.1993)), plaintiffs still

bear the burden of showing that he possesses some "knowledge, skill, experience, training, or

education" that qualifies him to give such opinions.  *Thomas v. Newton Int'l Enters.*, 42 F.3d

1266, 1269 (9th Cir. 1994) (citation and quotations omitted).  Dr. Hernandez's main criticism

in this area is that the District should have considered the future impact of new statewide

reforms under the LCFF.[4]  But plaintiffs did not provide any evidence that the District's

_____

[4] The LCFF is a statewide initiative sponsored by the Governor and being implemented in the
near future; plaintiffs claim it will provide additional educational funding to the District,
sufficient to make the school closures fiscally unnecessary.  (Hernandez Decl. Ex. 2, ECF 17-

approach to closures constitutes a deviation from standard practice in the field.  Without any evidence to that effect, the court cannot find that his conclusions are based on reliable principles and methods.

Lastly, the court excluded from consideration any of Dr. Hernandez's legal conclusions because such judgments are in the court's purview.

### 2.    Relevance

Dr. Hernandez's testimony that is reliably based on his expertise and experience, as discussed above, also meets the *Daubert* standard for relevance because it supports a showing of a disparate impact and serves to highlight procedural irregularities that may suggest a discriminatory purpose.  The court therefore permitted Dr. Hernandez to testify at hearing as to the racial composition of the closed schools and their neighborhoods.  He also was permitted to discuss his lay observations of Maple and C.B. Wire, and his opinions about future housing developments, as evidence that the District applied inconsistent or arbitrary criteria in making the closure decision.

### 3.    Lay Objections

For the same reasoning discussed above, the court sustains certain of defendant's objections to Dr. Hernandez's lay testimony.  His opinions about the racial motivations underlying the Board of Education's decision are speculative and the court excludes them from consideration.  The court also excludes his analysis of the District's finances as improper lay testimony, because such analysis requires a minimum level of expertise in budgetary issues specific to school districts.  The court overrules defendant's objections to hearsay testimony that served as a basis for Dr. Hernandez's valid expert conclusions.  FED. R. EVID. 703.

/////

---

14 at 12–13.)  Because Dr. Hernandez's testimony regarding the LCFF's impact on District finances does not meet *Daubert* standards for reliability, the court is not able to assess this claim.

C.      Objections to the Declarations of Parents and Guardians

Defendant objects to the admission of the declarations of Arthur Aleman, Paulina Ariza, Jessica Arriaga, Edward Camargo, Victoria Camargo, Karen Casillas, Chao Chang, Patricia Gentle, Pamela Jimenez, Lisa Romero, Cynthia Salazar and Christina Virgen on various evidentiary grounds.  In considering a motion for preliminary injunction, the court may consider otherwise inadmissible evidence and give it "some weight," given the time constraints and the need to prevent irreparable harm prior to trial.  *See Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1103 n.2 (C.D. Cal. 2007) ("[I]n the preliminary injunction context, the Court is not strictly bound by all rules of evidence.") (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).  Given this flexibility, the court, in its discretion, sustains a limited number of defendant's objections, but otherwise considers the objections in assigning appropriate weight to the evidence.

To the extent the parental declarations make conclusory statements about the rationale for the school closure decision, or the motivations of board members, the court sustains defendant's speculation objections.  (*See* Def's. Obj., ECF 59 at 11–14.)  The court sustains defendant's objections to hearsay in the Casillas declaration.  (*Id.* at 17–19.)  The court also sustains defendant's objections to the Salazar declaration (*id.* at 27–30), to the extent it expresses improper lay opinions about her grandson's medical or psychological health.  All general objections that the declarations are "stale" are overruled, as this is a factor in examining weight rather than admissibility.  The court notes that statements about the lack of transition information reflect declarants' knowledge at the time of the declarations.  If they are not addressed here, defendant's objections are overruled.

D.      Objections to the Declaration of Mark Merin

Defendant makes two objections to the declaration of Mark Merin (ECF 17-3): that it contains one statement that is speculative, lacks foundation and personal knowledge, and constitutes an improper lay and legal opinion; and contains another statement that mischaracterizes its own exhibit.  (Def's. Obj., ECF 60 at 2–3.)  Given the court's flexibility in
/////

the context of a preliminary injunction, *see Ticketmaster*, 507 F. Supp. 2d at 1103 n.2, the court overrules both objections and adjusts the weight of the evidence accordingly.

Defendant first objects to Mr. Merin's statement, "Irreparable injury will occur to Plaintiffs and others who, in the absence of the requested Preliminary Injunction, will have their community elementary school closed in violation of their federal and state constitutional rights." (ECF 60 at 2.)  The court overrules this objection, but recognizes the statement as argument.

Secondly, defendant objects to Mr. Merin's characterization and quotation from his own Exhibit 7 on best evidence grounds.  (*Id.* at 3.)  This objection is not well taken, as Federal Rule of Evidence 1002 applies only to testimony offered to prove "the content of a writing."  *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1023 (9th Cir. 2001).  In this case, the writing has been provided and Mr. Merin's declaration merely quotes from it.  The court declines to exclude the statement.

III.    FACTUAL AND PROCEDURAL BACKGROUND

A.    District Makeup and Prior Closures

The Sacramento City Unified School District is a public kindergarten-through-twelfth-grade ("K-12") district, comprising 82 schools serving 47,900 students in Sacramento's urban core.  (Raymond Decl., ECF 44 ¶¶ 4, 6.)  It is a high poverty district with 72 percent of the students qualifying for a free or reduced-price lunch during the 2012–2013 school year. (*Id.* ¶ 7.)  Thirty-eight percent of the students do not speak English at home, but rather one of 40 other languages spoken within the District.  The District sends communications to parents and children in Chinese, English, Hmong, Russian, Spanish and Vietnamese.  (*Id.* ¶ 9.)

The District's racial/ethnic make-up as a whole is 37 percent Hispanic or Latino, 18.3 percent Asian, 17.4 percent African American, 19 percent White, and 7 percent dual racial/ethnic character.  (*Id.* ¶ 7.)  The District's elementary schools are 38.56 percent Hispanic, 0.68 percent Native American, 16.37 percent Asian, 1.69 percent Pacific Islander, 15.28 percent African American, 20.63 percent White, and 5.50 percent mixed race.  (Simmons Decl. Ex. B, ECF 54-1.)  During the 2012–2013 school year, 73 of the District's 82 schools were

"majority minority," with students of color making up more than 50 percent of the student body.  (ECF 44 ¶ 10.)

During the past decade, the District's enrollment has declined by about ten percent, from 53,418 in the 2001–2002 school year to 47,939 in the 2011–2012 school year, with enrollment down by approximately another 1000 students in 2012–2013 school year and projected to decline by another 800 students in the 2013–2014 school year.  (*Id.* ¶ 11.)  The declining enrollment has translated to lower state funding for daily attendance.  (*Id.* ¶ 13.)  Other cuts in state money for public education and the loss of one-time federal funds forced the District to reduce $146 million from its budget, resulting in increased class size and the reduction or elimination of several categories of personnel.  (*Id.*)  As a result of the District's budget problems and declining enrollment, it has considered closing schools every year for the four years of Raymond's tenure, and in previous years as well.  It has actually closed nine schools, between 2005 and 2012.  (*Id.* ¶ 15; Hardin Young Decl., ECF 45 ¶¶ 6, 11.)

The California Department of Education has developed a document called "Closing a School Best Practices Guide" ("the Guide"), which suggests a process to guide the indisputably "anguishing" decision to close a school.  (Merin Decl. Ex. 3, ECF 17-6 at 1.)   The Guide suggests that a district should (1) form a 7-11 District Advisory Committee ("7-11 Committee"),[5] even though it is not required by the legislature, to gather the facts; and (2) base its decision to close the schools on a number of criteria, including: the condition of the facility, the operating costs, the capacity to accept excess students, any special program facilities (*e.g.*, for special education), environmental factors, the ethnic balance of the facility, transportation (including safe walking routes to new schools and transportation costs), other schools in the area of the closed schools, the nature of the educational programs, the aesthetics of the decision, and the potential value of the property.  (*Id.*)  Thereafter, the district should hold

---

[5] The Closing a School Best Practices Guide says District Advisory Committees are colloquially known as 7-11 Committees because of the legislative requirement that they be composed of not fewer than seven nor more than eleven members.  (Merin Decl. Ex. 3, ECF 17-6 at 1); *see* CAL. EDUC. CODE § 17389.

public meetings and, after any decision to close a school is made, announce the closure to the school staff and parents and begin the transition process.  (*Id.*)  Finally, the district should decide what to do with the closed school properties.  (*Id.*)  No evidence indicates, however, that the Guide is binding or that the District itself has binding procedures it is required to follow before closing schools.

Here, the District has not always used 7-11 Committees to facilitate the process of closing a school.  During the 2005–2006 school year, the work of a 7-11 Committee led to the closure of Marian Anderson Elementary School in 2006, although the goal of the 7-11 Committee was not to recommend schools for closure.  (ECF 45 ¶ 7; Dobson Decl., ECF 55 ¶ 5.)  The District did not use a 7-11 Committee in deciding to close Bear Flag Elementary School in 2007.  (ECF 45 ¶ 8; ECF 55 ¶ 5.)  During the 2008–2009 school year, the District decided to close Thomas Jefferson Elementary School, Alice Birney Elementary School, Lisbon Elementary School, and Genesis High School.  (ECF 45 ¶ 9.)  The District did not use a 7-11 Committee in making these decisions, but considered "multi-faceted and complex criteria" that included capacity, site condition, and operating costs, the proximity of schools with available space, the potential for growth at the sites, and the schools' poverty levels.  (ECF 55 ¶ 5; ECF 45 ¶ 9.)  Additionally, the District held twelve "community engagement meetings" between late November 2008 and mid-April 2009 before ultimately deciding to close the schools.  (ECF 45 ¶ 6; Hardin Young Decl. Exs. B & C, ECF 45-1; Hardin Young Decl. Ex. D, ECF 45-2.)  After making this last decision to close the schools, the District created a 7-11 Committee to decide how to use the sites of the closed schools.  (ECF 45 ¶ 10.)

B.     Closures Considered in 2010-2012

In 2010, the District Board of Education ("Board") created a new 7-11 Committee that met four times in May 2010 and presented a report to the Board at the October 19, 2010 Board meeting, proposing criteria to be used for identifying schools for closure.  (ECF 45 ¶ 12; Hardin Young Decl. Exs. I, J & K, ECF 45-2.)  The Board adopted the criteria at its December 9, 2010 meeting.  (ECF 45 ¶ 12; Hardin Young Decl. Exs. M, N, O, ECF 45-3.)  Under the criteria, schools considered for closing would be scored on capacity, condition, and

operational cost based on enrollment, which would be added to create a total score.  (Hardin Young Decl. Ex. N, ECF 45-3.)

In February 2011, the Board again created a 7-11 Committee to apply the criteria adopted in December 2010.  (Hardin Young Decl. Exs. P & Q, ECF 45-3.)  This 7-11 Committee met in August 2011 and presented its recommendations on October 6, 2011 to the Board that the District take the following actions: (1) close C.P. Huntington Elementary School; (2) close Oak Ridge Elementary School; (3) consolidate Hollywood Park and Leonardo da Vinci Elementary Schools; and (4) close A.M. Winn Elementary School.  (ECF 45 ¶ 14.) On November 3, 2011, Superintendent Raymond made the following recommendations to the Board: (1) close C.P. Huntington; (2) keep Oak Ridge open as a District Priority School; (3) create "Design Teams" for Hollywood Park and Leonardo da Vinci; (4) close A.M. Winn; (5) consolidate Edward Kemble and Cesar Chavez Elementary Schools; (6) close Freeport Elementary School; (7) consolidate and/or use a Design Team for John Still Elementary and Middle Schools; (8) add seventh and eighth grades to Father Keith B. Kenny Elementary School; and (9) use a Design Team for Caleb Greenwood K-8 School.  (ECF 45 ¶ 15; Hardin Young Decl. Ex. T, ECF 45-5; Hardin Young Decl. Ex. U, ECF 45-6.)  At Board meetings on December 8, 2011 and December 14, 2011, many members of the public commented on these proposed actions.  (ECF 45 ¶ 16; Hardin Young Decl. Exs. V, W, X & Y, ECF 45-6.)

On February 12, 2012, the Board approved the closure of Freeport Elementary School, decided to keep C.P. Huntington open, and postponed a decision on A.M. Winn.  (ECF 45 ¶ 17.)  There was extensive public comment on each of these decisions.  (Hardin Young Decl. Exs. Z & AA, ECF 45-6.)  On March 1, 2012, the Board approved the conversion of A.M. Winn into a Waldorf-Inspired School, based on input from a Design Team for A.M. Winn.  (ECF 45 ¶ 17.)  Ultimately, none of the 7-11 Committee's recommendations was approved.  (*Id.* ¶ 18.)  According to Assistant Superintendent Mary Hardin Young, "the process subjected the [Board]'s decision to extreme and perhaps unproductive scrutiny that undercut the fiscal bases requiring school closures and ultimately again caused the process to appear too subjective."  (*Id.*)  District Director James Dobson avers "it was apparent to [him] that in order

1    to successfully address the necessity of closing District schools to assist in addressing District

2    budget shortfalls, a less complicated and cumbersome process for closure recommendations

3    was called for."  (ECF 55 ¶ 8.)

4         C.     2012 Right-Sizing Proposal

5         In Fall 2012, Raymond told members of the District cabinet that for the next

6    round of closures, he would propose basing decisions solely on which schools were the most

7    under-enrolled, a process commonly referred to as "right-sizing."  (ECF 44 ¶ 16; ECF 45 ¶ 19;

8    ECF 55 ¶ 9.)  The District believed that applying this criterion would create the appearance of

9    objectivity, in contrast to the previous wave of closures, and best address the cause of the

10   District's budgetary problems.  (ECF 45 ¶ 20; ECF 55 ¶ 9.)  Accordingly, Raymond instructed

11   District staff to prepare a report discussing in detail the recommendation to close schools and

12   the reasons for the recommendations.  (ECF 44 ¶ 19.)

13        District staff prepared a report recommending the closure of eleven elementary

14   schools ("First Right-Sizing Report") and Raymond presented it to the Board for consideration

15   at its January 17, 2013 Board meeting.  (Dobson Decl. Ex. A, ECF 55-1; Raymond Decl. Ex. B,

16   ECF 44-1; Noguchi Decl. ECF 57 ¶¶ 7–8; ECF 44 ¶ 19.)  In formulating these

17   recommendations, District staff examined school capacity and calculated efficiency by dividing

18   current enrollment by capacity.  (ECF 55 ¶ 9; ECF 57 ¶ 7.)  Although the First Right-Sizing

19   Report does not identify the figures used to generate the list of schools recommended for

20   closure, a handout included with the Board presentation presents a table of all elementary

21   schools in the district ranked by this efficiency metric.  (Noguchi Decl. Ex. A, ECF 57-3 at

22   265.)

23        The table on the next page lists the eighteen least-efficient schools considered

24   for inclusion in the First Right-Sizing Report, beginning with the least efficient, with the

25   schools actually recommended for closure shaded in gray.  (*Id*.)  The percentage of non-white

26   students in the school's student body is shown in the right hand column.  (Simmons Decl. Ex.

27   A, ECF 54-1.)  According to the District, Father B. Kenny, Leataata Floyd and Oak Ridge were

28

First Right-Sizing Report

| School | Efficiency | % Non-White |
|---|---|---|
| Fruit Ridge | 30% | 95.8% |
| James Marshall | 35% | 62.5% |
| Washington | 38% | 87.7% |
| Tahoe | 38% | 83.5% |
| A.M. Winn | 38% | 57.6% |
| Susan B. Anthony | 39% | 97.1% |
| Father Keith B. Kenny | 39% | 96.5% |
| Collis P. Huntington | 39% | 92.4% |
| Leataata Floyd | 41% | 96.7% |
| Bret Harte | 41% | 90.3% |
| Oak Ridge | 42% | 96.1% |
| Joseph Bonnheim | 43% | 86.6% |
| Mark Hopkins | 44% | 96.9% |
| C.B. Wire | 44% | 96.2% |
| Mark Twain | 44% | 86.0% |
| William Land | 45% | 82.5% |
| John Morse Therapeutic | 45% | 72.4% |
| Maple | 46% | 96.5% |

1    not recommended for closure "because they are District Priority Schools, into which the

2    District had invested substantial staff and monetary resources." (*Id.*)[6] A.M. Winn, Mark

3    Twain, and William Land were removed from the list of recommended closures because of

4    anticipated increases in enrollment when schools higher on the list were closed. (*Id.*) John

5    Morse Therapeutic was not recommended for closure because it provides therapeutic services

6    to students with special emotional needs. (*Id.*)

7         Two days before the presentation of the First Right-Sizing Report to the Board,

8    on January 15, 2013, the District posted information about the recommendations on its website,

9    including the text of the First Right-Sizing Report. (ECF 57 ¶ 8; Noguchi Decl. Ex. A, ECFs

10   57-1 to 57-6.) On January 16, 2013, the day before the Board meeting, students in the schools

11   slated for closure were given a letter to take home, in the six District languages, informing

12   parents of the proposal and inviting them to the January 17, 2013 Board meeting. (ECF 44

13   ¶ 20; Raymond Decl. Ex. D, ECF 44-1; ECF 57 ¶ 9.)

14        At the January 17, 2013 Board meeting, Raymond presented the First Right-

15   Sizing Report and recommended closure of the eleven elementary schools identified: (1) Fruit

16   Ridge; (2) James W. Marshall; (3) Washington; (4) Tahoe; (5) C.P. Huntington; (6) Susan B.

17   Anthony; (7) Bret Harte; (8) Joseph Bonnheim; (9) Mark Hopkins; (10) Clayton B. Wire; and

18   (11) Maple. (ECF 44 ¶ 21.) During the meeting, the Board received comments from many

19   community members and feedback from Board members. (Dobson Decl. Ex. B, ECF 55-1 at

20   32–33.)

21   /////

22   _____

23   [6] The District established Priority Schools to address the problems at some of the District's
     "neediest" schools. (ECF 44 ¶ 45.) In March 2010, it designated six of its lowest performing

24   schools as Priority Schools: Father Keith B. Kenny Elementary School, Jedediah Smith
     Elementary School (now named Leataata Floyd, after a neighborhood activist and community

25   volunteer), Oak Ridge Elementary School, Fern Bacon Middle School, Will C. Wood Middle
     School, and Hiram Johnson High School. (*Id.* ¶¶ 47, 53.) At the beginning of the 2011–2012

26   school year, it designated Rosa Parks Middle School as a Priority School, largely because of its
     economically disadvantaged student population. (*Id.* ¶ 48.) All the Priority Schools have

27   predominantly minority populations; Leataata Floyd is 96.6 percent minority, the highest
     percentage in the district, and Father Keith B. Kenny is 96.1 percent minority. (*Id.* ¶ 51.)

28

18

1    After the Board's initial consideration of the First Right-Sizing Report, the

2    District scheduled community meetings at each school slated for closure, notifying the families

3    through the District's website, letters, automated telephone calls and a press release.  (ECF 57

4    ¶¶ 10–12.)   These meetings began on January 30, 2013 at Tahoe Elementary and continued

5    through February 19, 2013 at C.P. Huntington and Joseph Bonnheim.   (*Id.* ¶ 10; Noguchi Decl.

6    Ex. C, ECF 58 at 4.)  After January 30, 2013, there were two meetings per evening.  (Noguchi

7    Decl. Ex. C, ECF 58 at 4.)

8    In response to feedback from the January 17, 2013 Board meeting, Director

9    Dobson and other District staff conducted "walkthroughs" of the affected sites, reviewed data,

10   and reevaluated the method of measuring capacity.  (ECF 55 ¶ 11.)  As a result, the District

11   released a revised report on January 30, 2013 ("Second Right-Sizing Report"), which included

12   a revised list of schools ranked this time by lowest utilization rate.  (*Id.* ¶¶ 11–13; Dobson Decl.

13   Ex. C, ECF 55-2.)  The Second Right-Sizing Report describes how utilization was calculated.

14   (Dobson Decl. Ex. C, ECF 55-2.)  First, the District counted the number of District-owned

15   "teachable spaces" at each school, which consists of "ALL classrooms, including surplus

16   classrooms currently being used for Child Development/Preschool programs, Parent Resource

17   Centers, supplemental teacher's lounges, or such spaces as speech therapy rooms," but not

18   libraries.  (*Id.* (capitalization in original)).  "Next, the number of students that could be housed

19   in each classroom is calculated by using the current maximum teacher-to-student ratio by grade

20   level (smaller class size for Special Education classes and QEIA[7] schools are factored in).

21   Finally, classroom capacities are added together to arrive at a maximum capacity for the entire

22

23   [7] "QEIA" refers to the Quality Education Investment Act of 2006.  *Stockton Teachers Ass'n
     CTA/NEA v. Stockton Unified Sch. Dist.*, 204 Cal. App. 4th 446, 465 (2012).  The QEIA was
24   implemented to "improve the quality of academic instruction and the level of pupil
     achievement in schools in which pupils have high levels of poverty and complex educational
25   needs" and to "focus school resources, including all categorical funds, solely on instructional
     improvement and services to pupils."  CAL. EDUC. CODE § 52055.710 (c), (e)**.**  Funds
26   provided under the QEIA "may be expended for any purpose identified under the schoolsite's
27   Single Plan for Pupil Achievement . . . ."  CAL. EDUC. CODE § 52055.720(f).

28

school." (*Id.*)  Special formulas were used for counting smaller spaces, kindergarten classrooms, and Resource Specialist Program ("RSP") classrooms. (*Id.*)  Additional factors taken into consideration included "walking routes to school and transportation options; preparation of multiple options relative to possible receiving schools; completion of 'Grade Level Analysis'; and review of potential closing school enrollment by grade compared to receiving school enrollment by grade to determine space availability." (ECF 55 ¶ 14.)  As did the First Right-Sizing Report, the Second Right-Sizing Report determined "efficiency" by dividing current enrollment by the calculated capacity of the school. (Dobson Decl. Ex. C, ECF 55-2.)

Despite the recalculations, the eleven schools recommended for closure did not change. (*Id.*)  Based on the revised criteria in the Second Right-Sizing Report, the fifteen least-efficient schools in order of efficiency, along with the change in their efficiency, are shown in the table on the following page.  The eleven recommended closures are shaded in gray.[8]

As did the First Right-Sizing Report, the Second Right-Sizing Report removed schools from the closure list because of expected enrollment increases due to other schools nearby closing, and because they were District Priority Schools. (*Id.*)  Specifically, A.M. Winn was removed from consideration because of the anticipated impact of closing James Marshall, Father Keith B. Kenny was removed due to the anticipated impact of closing Fruit Ridge and Bret Harte, and Oak Ridge was removed because of the anticipated impact of closing Fruit Ridge. (*Id.*)  Oak Ridge, Father Keith B. Kenny and Leataata Floyd Elementary also were removed from the list because they are District Priority Schools. (ECF 55 ¶ 13.)

Raymond presented the Second Right-Sizing Report to the Board on February 21, 2013, approximately one month after the first report was posted on the District's website. (ECF 44 ¶ 28.)  Although the report recommended closing the same eleven schools as

---

[8] While Mark Twain, William Land, and John Morse Therapeutic were considered for closure during the preparation of the First Right-Sizing Report, they were not mentioned in the Second Right-Sizing Report as schools under consideration, and so are not included in this table.

Second Right-Sizing Report

| School | Efficiency | Change | % Non-White |
|---|---|---|---|
| Fruit Ridge E.S. | 31% | +1% | 95.8% |
| Washington E.S. | 31% | -7% | 87.7% |
| Collis P. Huntington E.S. | 33% | -6% | 92.4% |
| James Marshall E.S. | 36% | +1% | 62.5% |
| Susan B. Anthony E.S. | 36% | -3% | 97.1% |
| A.M. Winn E.S. | 39% | +1% | 57.6% |
| Father Keith B. Kenny E.S. | 39% | 0% | 96.5% |
| Tahoe E.S. | 40% | +2% | 83.5% |
| Oak Ridge E.S. | 41% | -1% | 96.1% |
| Leataata Floyd E.S. | 42% | +1% | 96.7% |
| Bret Harte E.S. | 42% | +1% | 90.3% |
| Joseph Bonnheim E.S. | 43% | 0% | 86.6% |
| Mark Hopkins E.S. | 44% | 0% | 96.9% |
| C.B. Wire E.S. | 44% | 0% | 96.2% |
| Maple E.S. | 44% | -2% | 96.5% |

had initially been proposed, at the Board meeting Raymond recommended removing Bret

Harte, Susan B. Anthony and James Marshall from the list.  (*Id.* ¶ 29.)  The recommendation as

to Bret Harte and Susan B. Anthony was prompted by new housing developments reportedly

planned for those neighborhoods and the potential for resulting increasing enrollment from new

populations moving into the area.  (*Id.* ¶ 29; ECF 55 ¶ 16.)  The recommendation to remove

James Marshall from the list was based on its proposed receiving school, A.M. Winn, being

converted to a Waldorf-inspired program, and James Marshall parents' opposition to their

children being directed to such a program.  (ECF 44 ¶ 29; ECF 55 ¶ 16.)  The recommendation

to delay the Tahoe closure decision was "in order to consider Mark Twain as a possible

alternative."  (Raymond Decl. Ex. J, ECF 44-2.)  In addition, the receiving school for Mark

Hopkins was changed to Rosa Parks from the originally proposed receiving schools of John

Sloat and John Bidwell.  (ECF 44 ¶ 29; ECF 55 ¶ 16.)

       The Board adopted Raymond's recommendations, by a bare majority, voting

four-to-three to approve Resolution No. 2734: Closure of Under Enrolled School Facilities,

thereby closing C.P. Huntington, Maple, Mark Hopkins, Fruit Ridge, Washington, Joseph

Bonnheim, and C.B. Wire.  (ECF 44 ¶ 30; Raymond Decl. Ex. L, ECF 44-3.)  At the next

Board meeting, on March 7, 2013, the Board approved Resolution No. 2739 to keep Tahoe and

Mark Twain open and to revise the closure plan for Fruit Ridge so that certain of its students

would attend Father Keith B. Kenny.  (ECF 44 ¶ 39; Raymond Decl. Exs. O, P, Q, ECF 44-3.)

The table on the next page lists the eighteen schools considered for closure during the entire

right-sizing process, ranked in order by percentage of non-white students.  The efficiency

calculations from the First and Second Right-Sizing Reports are shown in the second and third

columns, and the seven schools ultimately closed are shaded in gray.

       D.    Post-Closure Analysis by Dr. Hernandez

       As discussed above, plaintiffs presented the testimony of Dr. Hernandez at

evidentiary hearing.  His testimony focused on the racial composition of the schools closed and

their surrounding neighborhoods.  Dr. Hernandez first determined that many of the schools

Consolidated List of All Schools Considered For Closure

| School | Eff. (1st) | Eff. (2nd) | % Non-White | Outcome |
|---|---|---|---|---|
| Susan B. Anthony | 39% | 36% | 97.1% | Removed from the final list of 11 at Superintendent Raymond's request because of expected growth from nearby proposed housing projects. (Feb. 21, 2013.) |
| Mark Hopkins | 44% | 44% | 96.9% | Closed. (Feb. 21, 2013.) |
| Leataata Floyd | 41% | 42% | 96.7% | Removed from consideration in the Second Right-Sizing Report because it is a District Priority School. (Prior to Jan. 17, 2013.) |
| Maple | 46% | 44% | 96.5% | Closed. (Feb. 21, 2013.) |
| Father Keith B. Kenny | 39% | 39% | 96.5% | Removed from consideration in the Second Right-Sizing Report because it is a District Priority School, and because of the anticipated impact of closing Bret Harte and Fruit Ridge. (Prior to Jan. 17, 2013.) |
| C.B. Wire | 44% | 44% | 96.2% | Closed. (Feb. 21, 2013.) |
| Oak Ridge | 42% | 41% | 96.1% | Removed from consideration in the Second Right-Sizing Report because it is a District Priority School, and because of the anticipated impact of closing Fruit Ridge. (Prior to Jan. 17, 2013.) |
| Fruit Ridge | 30% | 31% | 95.8% | Closed. (Feb. 21, 2013.) |
| Collis P. Huntington | 39% | 33% | 92.4% | Closed. (Feb. 21, 2013.) |
| Bret Harte | 41% | 42% | 90.3% | Removed from the final list of 11 at Superintendent Raymond's request because of expected growth from nearby housing projects. (Feb. 21, 2013.) |
| Washington | 38% | 31% | 87.7% | Closed. (Feb. 21, 2013.) |
| Joseph Bonnheim | 43% | 43% | 86.6% | Closed. (Feb. 21, 2013.) |
| Mark Twain | 44% | 45% | 86.0% | Not considered in the Second Right-Sizing Report because of the anticipated impact of closing Tahoe. (Prior to Jan. 17, 2013.) Reconsidered for closure, but ultimately kept open. (Mar. 7, 2013.) |
| Tahoe | 38% | 40% | 83.5% | Removed from final list of 11 at Superintendent Raymond's request for reasons not included in the record. (Feb 21, 2013.) Reconsidered for closure, but ultimately kept open. (Mar. 7, 2013.) |
| William Land | 45% | 45% | 82.5% | Not considered in the Second Right-Sizing Report because of anticipated impact of closing Washington. (Prior to Jan. 17, 2013.) |
| John Morse Therapeutic | 45% | 53% | 72.4% | Not considered in the Second Right-Sizing Report because it provides therapeutic services to students with special emotional needs. (Prior to Jan. 17, 2013.) |
| James Marshall | 35% | 36% | 62.5% | Removed from final list of 11 at Superintendent Raymond's request because intended receiving school (A.M. Winn) has a Waldorf-inspired program. (Feb 21, 2013.) |
| A.M. Winn | 38% | 39% | 57.6% | Removed from consideration in the Second Right-Sizing Report due to the anticipated impact of closing James Marshall. (Prior to Jan. 17, 2013.) |

initially recommended for closure by the 7-11 Committee in 2011 were located in white, affluent neighborhoods, although their student bodies often did not reflect the neighborhood populations.  (ECF 76 at 5–11.)  He undertook a similar analysis of the schools removed from consideration during the right-sizing process begun in fall 2012, noting for example that Bret Harte was in the predominantly white Curtis Park neighborhood but that its school population was only 12 percent white; this led him to conclude that the neighborhood by itself could not support the school.  (*Id.* at 13.)  He similarly noted that A.M. Winn was in a majority white neighborhood, while its school population was majority minority, the same circumstances present in the neighborhoods and populations of James Marshall and Tahoe Elementary.  (*Id.* at 14–15.)  As noted above, Dr. Hernandez's definition of "neighborhoods" for the purpose of his analysis was defined by census tracts, which do not align with the District's school attendance boundaries.  (*Id.* at 51–54.)

Dr. Hernandez looked next at the seven closed schools' neighborhoods and student populations, finding that each school was situated in a largely minority neighborhood and had a majority minority enrollment.  (*Id.* at 15–18.)  The only exception to the pattern was Washington, the one school located not in South Sacramento but close to downtown. Washington's neighborhood is 57 percent white, but the school enrollment is only 13 percent white, with the minority population drawn from the concentration of Hispanic residents in the neighborhood.  (*Id.* at 17–18.)

According to Dr. Hernandez, there is current and planned development around Washington, including the already completed La Valentina affordable housing development on 12th Street and other brownstone-style condos and live-work lofts already built or being built, generally geared to young people who are in their childbearing and parenting years.  (*Id.* at 18–21.)  He contrasted this to the Curtis Village development near Bret Harte and the proposed Delta Shores project near Susan B. Anthony, neither of which will be ready for occupancy for several years.  (*Id.* at 24–28.)  The District justified removing Bret Harte and Susan B. Anthony from the right-sizing closure list because of their respective proximity to these developments. (ECF 44 ¶ 29.)

As discussed above, Dr. Hernandez presented lay evidence about the District's capacity calculations used to determine school efficiency. He first examined the procedures described in the Second Right-Sizing Report and then visited C.B. Wire and Maple to understand, after talking to unidentified people at those sites, whether the calculations were valid measurements of school capacity. (ECF 76 at 28–29.) He determined that some of the rooms identified as teachable spaces were actually teacher work rooms, computer labs, physical education rooms, and parent resource centers. (*Id.* at 29–31.) He also found that the District had counted space off campus being used for preschools, and included small spaces that would not be able to hold a class of 31 students. (*Id.* at 31–32.) Based on these findings, Dr. Hernandez recalculated the capacities of C.B. Wire and Maple and then recalculated their relative efficiency. (*Id.* at 32–33.) He determined that C.B. Wire's efficiency would improve from 44 percent to 63 percent, and Maple's from 44 percent to 58 percent. (*Id.*) Although Dr. Hernandez compared his revised percentages to the percentages prepared by the District, and concluded that both C.B. Wire and Maple are two of the most efficient schools in the District, the court does not accept that conclusion because it is not supported by the record as a whole. Because Dr. Hernandez applied different criteria than the District's, but only to two schools, it is unreasonable to compare the recalculated capacities of only these two schools to the rest of the list calculated in a different manner.

IV.    LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

As provided by Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction to preserve the relative position of the parties pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Munaf v. Green*, 553 U.S. 674, 689–90 (2008).

Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or "serious question" test, which allowed a court to balance the elements of the test "so that a

stronger showing of one element may offset a weaker showing of another." *See Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).  Recently, the Circuit found that its sliding scale test survived *Winter*: a court may issue a preliminary injunction when a plaintiff raises serious questions going to the merits and demonstrates that the balance of hardships tips sharply in his favor, so long as the court also considers the remaining two prongs of the *Winter* test.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  However, a court need not reach the other prongs if the moving party cannot as a threshold matter demonstrate a "fair chance of success on the merits."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008)) (internal quotations omitted).

V.      ANALYSIS

        The court considers plaintiffs' likelihood of success on the merits of the three claims currently before the court: Equal Protection, ADA, and Due Process.

        A.      Equal Protection

        The Equal Protection clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Even without direct evidence of discrimination, a plaintiff may demonstrate an Equal Protection violation by showing both discriminatory impact and evidence of discriminatory intent.  *Village of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 257–59 (1977); *Washington v. Davis*, 426 U.S. 229, 240–43 (1976).  In certain cases, "proof of disproportionate impact on an identifiable group, such as 'gross statistical disparities,' can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy."  *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (citing *Arlington Heights*, 429 U.S. at 264–66).

        Plaintiffs allege that the District's choice of the schools to be closed violated the Equal Protection clause because schools with greater percentages of minority students were impacted more than schools with relatively high percentages of white students.  As evidence of

intentional discrimination, in addition to differences in the racial makeup of affected and unaffected schools, plaintiffs argue that the decision-making process shows the District purposefully targeted minority schools.  Plaintiffs also argued at hearing that the District's closure decision reflected discrimination against schools in majority-minority neighborhoods in favor of schools located in neighborhoods with higher populations of whites.  As noted, plaintiffs used data from the U.S. Census to support this contention.  The court declines to consider this argument because the parties agree that the census tracts do not align with the District's attendance zones, rendering a fair comparison of the populations in each relevant area impossible in light of the record before the court.

Defendant asserts that plaintiffs' Equal Protection claim cannot succeed because there is no evidence of disparate impact in the closure decisions, as many of the schools that remained open had high minority enrollments.  Statistics submitted by the District show that 18.81 percent of the students in the District are white and 81.19 percent are racial minorities.  The statistics support the following additional calculations: At the eighteen least-efficient schools initially considered in the right-sizing process, 12.1 percent of students are white and 87.9 percent are non-white.  At the fifteen schools considered for closure in the Second Right-Sizing Report, 11.47 percent of students are white and 88.53 percent are minorities.  Of the students attending the seven schools slated for closure, 6.65 percent are white and 93.35 percent are minorities.[9]

---

[9]   The court calculated these figures using data from Exhibit A to the Simmons Declaration, which lists the total enrollment for each school during the 2012–2013 school year, as well as the number of students of each racial group attending individual schools.  (Simmons Decl. Ex. A, ECF 54-1.)  To calculate the percentage of students at the eighteen schools in the First Right Size Report who are white, the number of white students attending those schools was divided by the total number of students attending those schools.  Likewise, to calculate the percentage of students at the eighteen schools in the First Right Size Report who are racial minorities, the number of minority students attending those schools was divided by the total number of students attending those schools.  This method was applied to calculate percentages of white and minority students attending the fifteen schools on the Second Right-Sizing Report list and the seven schools selected for closure.

In *The Committee Concerning Community Improvement v. City of Modesto*, residents of majority-Latino neighborhoods outside the City of Modesto brought an Equal Protection claim against the city, based on the exclusion of the neighborhoods from an agreement between the city and the county allocating tax revenues for neighborhoods that were annexed into the city. 583 F.3d 690, 697 (9th Cir. 2009). Plaintiffs' expert stated that the difference in Latino population between the neighborhoods excluded from the tax agreement, 71 percent, and the neighborhoods included in the tax agreement, 48 percent, was statistically significant. *Id.* at 703. The difference demonstrated a disparate impact sufficient to survive summary judgment; even though the racial disparity did not exist at the time the agreement was enacted, the excluded neighborhoods had increasing Latino populations. *Id.* at 703–04. Moreover, the court clarified, a disparate impact resulted even though whites living in the majority-Latino neighborhoods were also adversely affected. *Id.* at 704–05.

Here, although plaintiffs have not submitted an expert report representing that there is a statistically significant difference in the racial composition of the schools selected for closure when compared with the schools that remained open, the court finds based on admissible evidence in the record that the school closures will have a disparate impact on racial minorities. Even taking account of the majority of the District's students who are members of minority groups, the percentage of white students impacted by the closures is low compared to the amount of white students in the District overall. There also is a disparity between the schools with the lowest operating efficiency that remained on the closure list and those that did not: the percentage of white students whose schools were listed for closure was reduced from 12.1 percent to 6.65 percent between the time the District first calculated efficiency and then later approved the final revised closure list. But disparate impact is not enough to establish success on the merits on an Equal Protection claim.

To prove a discriminatory purpose, a plaintiff must show the state action occurred "because of" and not merely "in spite of" a suspect classification, such as race. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Official conduct that impacts members of some races differently than members of another race is not unconstitutional unless there is an

28

intent to discriminate.  *Davis*, 426 U.S. at 239–40.  In *Davis*, the Supreme Court rejected an Equal Protection claim based on a police examination that was administered equally to both Caucasians and African-Americans, but resulted in a disproportionate number of African-American applicants being disqualified during the hiring process.  *Id.* at 233.  Because plaintiffs relied solely on the results of the examination and did not claim there was a discriminatory intent behind the implementation of the test, the Court held there was no Equal Protection violation.  *Id.* at 235.

In *Arlington Heights*, 429 U.S. at 257–59, the Court elaborated on factors that can show discriminatory intent.  The plaintiffs challenged a predominantly white town's refusal to rezone a parcel of land to allow for construction of affordable, multi-family housing that would attract racially diverse residents.  "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."  *Id.* at 267; *see also Rogers v. Lodge*, 458 U.S. 613, 623 (1982) (fact there had been African-American candidates for county office, but never any African-American elected, "bear[s] heavily on the issue of purposeful discrimination").  Additionally, the specific sequence of events leading up to the challenged government action may provide evidence of discriminatory intent.  Departures from standard procedures may indicate bias.  *Arlington Heights*, 429 U.S. at 267.  Finally, the legislative or administrative history may provide sufficient evidence to show a discriminatory intent, particularly when comments are recorded in the minutes.  *Id.*; *cf. City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 195–96 (2003) (comments showing racial bias made by private citizens opposing affordable housing development were irrelevant to Equal Protection claim against the city, because there was no evidence that decision-makers had similar motivation).

Other district courts have considered Equal Protection claims in the school-closing context.  In *Genshaw v. Del Norte County Unified School District*, the court denied a school district's motion to dismiss Native American students' Equal Protection claim, which was based on the district's decision to move students at the middle school with the highest Native American enrollment to a different school.  No. C 07-3009 TEH, 2008 WL 1777668

(N.D. Cal. Apr. 18, 2008).  The complaint alleged that the district's committees formed to explore cost-cutting measures proposed three alternatives: closing a predominantly white elementary school; eliminating grades six through eight of a second predominantly white school and busing them to a different school; or busing the students in grades six through eight of the Native American students' school to another school.  *Id.* at *1.  The committees noted that the last alternative would save the least amount of money.  *Id.*  The school board held meetings specifically to discuss possible closures with the parents of children attending the two predominantly white schools, but only discussed the possible closure of plaintiffs' school at an unrelated meeting; contrary to its typical practice, the board did not take notes during this last meeting.  *Id.* at *2.  These facts were sufficient to state a claim that the school district's decision to partially close plaintiffs' school evinced discriminatory intent.  *Id.* at *4.

In contrast, the court in *Smith v. Henderson* concluded there was no evidence to support a finding of discriminatory intent in the District of Columbia's closure of schools whose student bodies were almost entirely composed of racial minorities, while leaving schools with relatively high percentages of white students open.  ___ F. Supp. 2d ___, No. 13-420 (JEB), 2013 WL 2099804 (D.D.C. May 15, 2013).  The district had decided to close the schools in response to a significant decline in the district's student enrollment, which was especially severe in poor, minority sections of the district.  *Id.* at *1–2.  The district held several hearings and meetings about its proposed closure list and revised the list based on community input.  *Id.* at *2.  Although the district's action clearly had a disparate impact, plaintiffs offered no evidence contradicting the district's assertion that it made its decision based solely on saving money and focusing on the most under-enrolled schools.  *Id.* at *10.  The court denied plaintiffs' request for a preliminary injunction to keep the schools open.

Here, plaintiffs assert that in addition to the differences in racial composition of the student bodies for the schools that were closed compared to the schools that remained open, discriminatory intent can be inferred from the District's procedures leading to closing the schools.  Specifically, plaintiffs argue that the District's method for calculating efficiency is inaccurate and reveals bias against minority schools.  Additionally, plaintiffs claim that once

the District had ranked the schools with the lowest enrollment in relation to capacity, the District's removal of certain schools from the list of proposed closures demonstrates racial bias.

In light of the record before the court, plaintiffs' argument that the efficiency calculations are based on racial animus is unavailing. The majority of the evidence offered to support this claim came from the testimony of Dr. Hernandez, who recalculated capacity and efficiency only at Maple and C.B. Wire based on his own criteria. Plaintiffs cannot show that the District used the capacity criterion to discriminate against minority schools without showing either that the District's method was inconsistently applied across schools in a racially unbalanced way, or that if capacity is more accurately re-calculated across all schools, it exposes a racial bias in the District's methods. Plaintiffs have presented no evidence to support either conclusion.

The District's removal of certain schools from the list of those with lowest efficiency based on its own criteria is more troubling. The fact that the District eliminated schools from the lists in the First and Second Right-Sizing Reports, based on criteria other than efficiency, contradicts the District's representation that this round of closures was based on a single, objective criterion. Moreover, the District's reasons for removing certain schools from consideration do not appear to have been consistently applied. Dr. Hernandez testified that the Washington school would likely experience an increase in school-aged children in coming years, due to the nearby La Valentina housing development. Yet, Washington was closed while Susan B. Anthony and Bret Harte were taken off the list in light of proposed new housing developments, not yet built. Additionally, the District removed A.M. Winn from the closure list initially because its student body was expected to grow when James Marshall was closed. Inexplicably, A.M. Winn is slated to remain open even after James Marshall also was removed from the closure list. The District also gave no rationale for postponing the closure decision for Tahoe and then ultimately deciding to keep both it and Mark Twain open. Finally, plaintiffs argue that the short period of time between proposing the school closures on January 17, 2013 and finalizing the decision on February 21, 2013, in contrast to the prior five-month decision

period leading to the closure of Freeport in February 2012, demonstrates that the District disregarded the interests of minority students and their families.

Defendant asserts that the facts of this case are nearly identical to those in *Smith*. As in this case, minority students in *Smith* were disproportionately affected by the District of Columbia's closures, even considering that the student body is majority minority, and closure decisions were based on unused capacity. But in contrast to this case, plaintiffs in *Smith* did not argue that once schools with the lowest efficiency were identified, schools were removed from the closure list for discriminatory reasons.

Nonetheless, the record as a whole on removal of certain schools from the closure list does not support a finding of discriminatory intent by the District. There is insufficient evidence to conclude that the District used its process purposely to "save" schools with more white students at the expense of schools with more minority students. Of the five schools removed from the closure list based on an anticipated increase in their student bodies as a result of closure of schools further up the list, both Father Keith B. Kenny and Oak Ridge had relatively low percentages of white students, 3.5 percent and 3.9 percent, respectively; both also are District Priority Schools. Additionally, District Priority School Leataata Floyd Elementary was removed from the closure list and only 3.3 percent of its student body is white.[10] Both Bret Harte and Susan B. Anthony, removed from the closure list because of purported anticipated growth from future housing developments, have lower percentages of white students than Washington, the school plaintiffs argue should have been removed for the same reason: 9.7 percent and 2.9 percent, compared with 12.3 percent, respectively. Plaintiffs do not argue that removing John Morse Therapeutic from the closure list because it provides

---

[10] Dr. Hernandez testified that the right-sizing committee evaluated schools for capacity and that priority schools were eliminated from that process. (ECF 76 at 59.) He also testified that he did not include priority schools in his calculations because they were evaluated using different criteria. (*Id.* at 60.) The District did calculate the capacity/efficiency of the priority schools but later removed them from consideration. (Noguchi Decl. Ex. A, ECF 57-3 at 265; ECF 55 ¶ 13.)

therapeutic services was invalid.  By itself, the unexplained removal from the list of Tahoe, with 16.5 percent white students, does not indicate discriminatory intent.

Ultimately it is true that 78.3 percent of white students attending the initial eighteen schools considered for closure had their schools remain open, compared to only 58.1 percent of minority students.[11]  But a number of the schools removed from the closure list had high percentages of minority students, and plaintiffs have identified no "smoking gun" that exposes discriminatory animus on the part of defendant Raymond or the District he supervises. Plaintiffs have not shown that the District acted on improper motives.

Finally, the fact that the closure decisions were conducted in a short period of time does not show that the District intended to discriminate against minority students. Plaintiffs have not established that the District has a standard procedure for school closings from which it deviated in selecting the seven schools slated for closure.  Parents of students at each school considered for closing were informed of the decision-making process; even if they were unable to make the first Board meeting in January, they were able to attend community meetings about the closures and the February Board meeting as well.

Because plaintiffs have not presented sufficient evidence to show intentional discrimination, they are unlikely to succeed on the merits of their claim.

B.    Americans with Disabilities Act

In their third claim, plaintiffs assert the school closures discriminate against disabled children in violation of the ADA, 42 U.S.C. § 12132.[12]  (ECF 17-1 at 12.)  They allege three named plaintiffs in this action have qualifying disabilities, in that the ADA defines

---

[11] The court calculated these figures using data from Exhibit A to the Simmons Declaration. (ECF 54-1.)  The court divided the total number of white students attending the eighteen schools ever considered for closure by the number of white students attending the seven schools that were actually closed.  This method was repeated to obtain percentages for minority students.

[12] Section 12132 reads in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

1   "disability" to include a "record of such impairment."  42 U.S.C. § 12102(2).  (*Id.*)  Plaintiff

2   D.A. has been diagnosed with ADD.  (ECF 17-21 ¶ 3.)  Plaintiff J.M. has been diagnosed as

3   emotionally disturbed.  (ECF 17-30 ¶ 2.)  Plaintiff C.S. has been diagnosed with autism,

4   ADHD, and dyslexia.  (ECF 17-29 ¶ 2.)

5           Plaintiffs contend the school closures discriminate against these three plaintiffs

6   because their new schools will not provide the special education programs they enjoyed at their

7   old schools.  (ECF 17-1 at 12.)  Plaintiff D.A.'s educational program took six months for

8   school staff, his doctors, and his mother to develop.  (*Id.*)  The District has stated it will not

9   provide transportation for after-school programs, "many of which specifically benefit D.A.'s

10  disability."  (*Id.* citing ECF 17-21 ¶ 4).)  Plaintiff J.M.'s mother has also spent many months

11  developing J.M.'s IEP with her teacher.  (*Id.*)  The District has indicated not all programs

12  available at current schools will be available at reassigned schools and that it will not provide

13  transportation for after-school programs.  (*Id.* at 13 (citing ECF 17-30 ¶ 5).)  J.M.'s family will

14  be forced to pay for public transportation so she can receive the benefit of her special education

15  programs.  (*Id.*)  Plaintiff C.S.'s assigned RSP teacher will not transition with him to his new

16  school.  (*Id.* (citing ECF 17-29 ¶ 5).)

17          Plaintiffs argue disparate impact claims are cognizable under the ADA.  (*Id.*

18  (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)).)  Liability for disparate treatment

19  hinges upon whether the protected trait motivated the defendant to treat disabled individuals

20  less favorably than those who are not disabled.  (*Id.* (citing *Raytheon*, 540 U.S. at 53).)

21  Plaintiffs assert defendant specifically targeted the disabled by using the efficiency criterion,

22  which singles out schools that had constructed extra space to accommodate special education

23  programs.  (*Id.*)  In reality, plaintiffs contend, defendant is double-counting this extra space to

24  reach the desired conclusion that a particular school is underutilized.  (*Id.*)

25          Defendant argues plaintiffs cannot prevail on the merits of their ADA claim

26  because plaintiffs did not exhaust Individuals with Disabilities Education Act ("IDEA")

27  administrative remedies and because all plaintiffs do not make out a *prima facie* case of

28

discrimination.  (Raymond Mem., ECF 40 at 11.[13])  Defendant contends plaintiffs J.M. and

C.S. are required to exhaust IDEA administrative remedies because they seek relief that is also

available under the IDEA — namely, they seek an injunction to modify their educational

placements.  (*Id.* at 11–13 (citing *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 875 (9th Cir.

2011)).)  Defendant also asserts plaintiffs do not state a *prima facie* case for discrimination

under the ADA because they do not demonstrate they are being denied "meaningful access" to

state-provided services.  (*Id.* at 15 (citing *Alexander v. Choate*, 469 U.S. 287, 302 (1985)).)

    1. Exhaustion

    Under the Ninth Circuit's relief-centered approach, a plaintiff is required to

exhaust IDEA administrative remedies, even when bringing claims under other statutes like the

ADA, when he seeks any remedy that is available under the IDEA.  *Payne*, 653 F.3d at 875.  In

sum, exhaustion is required in three circumstances: (1) when the plaintiff seeks an IDEA

remedy or its equivalent; (2) when the plaintiff seeks prospective injunctive relief to alter an

IEP or the educational placement of a disabled student; and (3) when the plaintiff is alleging a

denial of a free appropriate public education ("FAPE").  *Id.*  If a plaintiff is required to exhaust

administrative remedies but does not do so, federal courts do not have jurisdiction to entertain

that plaintiff's unexhausted claims.  *Id.* at 867 (quotations and citation omitted).

    Given the state of the law, plaintiffs J.M. and C.S. are required to exhaust

administrative remedies.  In their complaint and their declarations, these plaintiffs state that as a

result of defendant's discrimination, they will be denied the benefits of the programs currently

prescribed in their IEPs.  As noted, J.M. asserts the District has indicated not all programs

available at current schools will be available at reassigned schools and that the District will not

provide transportation for after-school programs.  (*Id.* at 13 (citing ECF 17-30 ¶ 5).)  J.M. also

alleges her family will be forced to pay for public transportation so she can receive the benefit

of her special education programs.  (*Id.*)  Plaintiff C.S. alleges his RSP teacher will not

---

[13] Because defendant fully incorporates his arguments from the motion to dismiss (ECF 40) into his opposition to the instant motion (Raymond Opp'n, ECF 42 at 11), the court references defendant's arguments as contained in the motion to dismiss.

transition with him to his new school.  (*Id.* (citing ECF 17-29 ¶ 5).)  In effect, these two plaintiffs seek an injunction to stop the District from modifying their current IEPs and educational placements.  This injunctive relief is a remedy available under the IDEA.  *Payne*, 653 F.3d at 875.  Accordingly, plaintiffs J.M. and C.S. are first required to pursue administrative remedies.  Because there is no indication these plaintiffs sought administrative relief, this court lacks jurisdiction over their ADA claim and will not consider their allegations in determining whether plaintiffs have stated a *prima facie* case for discrimination under the ADA.

### 2. Prima Facie Case

A plaintiff bringing a disparate impact claim under the ADA must show he or she was denied "meaningful access" to state-provided services.  *Hunsaker v. Contra Costa Cnty.*, 149 F.3d 1041, 1043 (9th Cir. 1998).  In her declaration, D.A.'s mother states that D.A.'s teachers, doctors, and other staff have implemented a comprehensive plan in school and at home that has worked for him.  (ECF 17-21 ¶ 3.)  Disruptions in this program will trigger inappropriate responses in his behavior, and it is unclear whether D.A.'s teachers will transition with him.  (*Id.* ¶ 4.)  Further, D.A.'s mother states that the transition to a new school will cause additional hardship because, as a working single mother, she is "unable to take [him] to school at 9 a.m. due to [her] job schedule."  (*Id.* ¶ 7.)

Assuming without deciding that plaintiff D.A. is an ADA beneficiary, the court finds plaintiffs have not established a *prima facie* case of discrimination under the ADA.  While the court is sympathetic to D.A's circumstances, D.A.'s mother's declarations do not demonstrate D.A. will be denied meaningful access to an education or to special education programs.  Plaintiffs do not allege D.A. will be denied an education or an opportunity to benefit from his comprehensive plan that has worked well for him.  While the transition to a new school may be difficult, this fact does not amount to a denial of meaningful access to special education programs.

Plaintiffs are not likely to succeed on the merits of their ADA claim.

1    C.    Procedural Due Process

2        Plaintiffs' fourth claim alleges a violation of procedural Due Process under the

3   Fourteenth Amendment.  Plaintiffs allege that defendant's "inadequate or deficient notice,

4   procedures, and discriminatory decision-making" violated, and will continue to violate, their

5   federal due process rights.  (ECF 36 ¶ 66.)  At hearing, plaintiffs clarified this claim rests on

6   plaintiffs' liberty interests.

7        Defendant argues plaintiffs cannot prevail on the merits of their due process

8   claim because plaintiffs have not based the claim on a cognizable interest, whether liberty or

9   property.  (ECF 40 at 17.)  Defendant contends that plaintiffs' purported fundamental interests

10  under federal law in Equal Protection and non-discrimination based upon disability, and under

11  California law in the right to a publicly-funded equal educational opportunity, are insufficient

12  to support plaintiffs' procedural Due Process claim.  (*Id*.)  Defendant asserts that an exhaustive

13  search for authority yields no support for plaintiffs' position that these identified interests are

14  protected liberty or property interests for the purposes of procedural Due Process.  (*Id*.)

15       "[T]he Due Process Clause provides that certain substantive rights — life,

16  liberty, and property — cannot be deprived except pursuant to constitutionally adequate

17  procedures."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  A claim for a

18  procedural Due Process violation has two distinct elements: the deprivation of a

19  constitutionally protected liberty or property interest and denial of adequate procedural

20  protection.  *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d

21  963, 970 (9th Cir. 2010) (citing *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149

22  F.3d 971, 982 (9th Cir. 1998)).  Plaintiffs must first establish a property or liberty interest

23  deserving of constitutional protection before a court addresses whether adequate process was

24  denied.  *See Loudermill*, 470 U.S. at 541 ("Respondents' federal constitutional claim depends

25  on their having had a property right in continued employment."); *Brewster*, 149 F.3d at 983

26  ("[O]nce a court determines that a protected property interest has been taken, 'the question

27  remains what process is due.'") (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972));

28

*Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013) ("For [defendant] to be entitled to due process we first must find that he has a liberty interest triggering procedural protections.").

Liberty interests can arise from either the Due Process Clause or state law. *Chappell*, 706 F.3d at 1062; *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992) ("A state creates a protected liberty interest when it places substantive limitations on official discretion."). A liberty interest is created when a state's regulation of officials' decision-making procedures contains "explicitly mandatory language" that mandate specific outcomes if standardized criteria are met. *Mendoza*, 960 F.2d at 1429 (quoting *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 463 (1989)).

Here, plaintiffs' asserted fundamental liberty interests in equal protection, non-discrimination based upon disability, and equal education opportunities, do not satisfy the first element of a procedural Due Process claim. The court has determined above that plaintiffs are not likely to succeed on claims they are being deprived of Equal Protection or non-discrimination based upon disability. Plaintiffs provide no authority for their argument that their interest in equal education opportunity creates a liberty interest protectable under the Due Process clause. The California Education Code does not create a protected liberty interest entitling plaintiffs to certain procedures when school officials decide to shutter schools. California Education Code § 17388 provides only that a district may appoint a 7-11 Committee when considering the use or disposition of school buildings.[14] It does not include "explicitly mandatory language" that requires the appointment of an advisory committee, nor are district officials required to follow a committee's recommendations. *Mendoza*, 960 F.2d at 1428.

Even if plaintiffs asserted their interests in equal education opportunity as a constitutionally protected property interest, they are not deprived of their interest in equal

---

[14]  Section 17388 reads: "The governing board of any school district may, and the governing board of each school district, prior to the sale, lease, or rental of any excess real property, except rentals not exceeding 30 days, shall, appoint a district advisory committee to advise the governing board in the development of districtwide policies and procedures governing the use or disposition of school buildings or space in school buildings which is not needed for school purposes."

education opportunity because the District is providing them with a substantially similar education at other school sites.  "[T]ransfer to another school does not itself constitute a deprivation of education — instead, there must be a showing that the alternative school is significantly inferior."  *Lindsey v. Matayoshi*, No. CIV. 11-00713 JMS, 2013 WL 3092450, at *9 (D. Haw. June 19, 2013) (quoting *Swindle v. Livingston Parish Sch. Bd.*, 655 F.3d 386, 394 (5th Cir. 2011)) ("'[A] student who is removed from her regular public school, but is given access to an alternative education program, has not been denied her entitlement to public education.'"); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1359 (6th Cir. 1996) (a student "may not have procedural due process rights to notice and an opportunity to be heard when the sanction imposed is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school"); *Zamora v. Pomeroy*, 639 F.2d 662, 669–70 (10th Cir. 1981) (no Due Process violation absent a showing that the alternate school was so significantly inferior that it amounted to expulsion from the educational system).  While plaintiffs allege they will not receive identical educational opportunities at their new schools and in some instances will not be provided transportation, they do not provide evidence showing the new receiving schools are significantly inferior.

Because plaintiffs have not shown they are likely to succeed in proving a deprivation of a protected interest, the court does not reach the question whether defendant adhered to constitutionally adequate procedures, the second element of a procedural Due Process claim.

VI.    CONCLUSION

Plaintiffs do not have a fair chance of success on the merits of any of their three claims.  A preliminary injunction is not warranted based on the evidence of record at this time.

Plaintiffs' motion for preliminary injunction is DENIED.

IT IS SO ORDERED.

DATED:  July 22, 2013.

_____
UNITED STATES DISTRICT JUDGE